UNITED STATES DISTRICT COURT

DISTRICT OF NEVADA

| | |
|---|---|
| AVIATION INSURANCE SERVICES OF NEVADA, INC., *et al.*,       )<br>                                                             )<br>           Plaintiffs,                                       )<br>                                                             )<br> vs.                                                         )<br>                                                             )<br> LESLIE DEWALD, *et al.*,                                    )<br>                                                             )<br>           Defendants.                                      )<br> _____ ) | Case No.  2:10-cv-01536-LDG-GWF<br><br>**ORDER**<br><br>Motion to Compel (#62) |

This matter is before the Court on Plaintiffs' Motion to Compel (#62), filed on October 7, 2011; Defendants' Opposition to Motion to Compel (#66), filed on October 24, 2011; Lionel Sawyer & Collins Opposition to Motion to Compel (#65), filed on October 24, 2011; attorney Adam D. Smith's Limited Opposition to Motion to Compel (#75), filed on November 4, 2011; and Plaintiff's Reply in Support of Motion to Compel (#74), filed on November 3, 2011.  The Court originally conducted a hearing in this matter on November 10, 2011 at which time the parties informed the Court that they were close to settlement and wished to postpone the hearing and decision on the motion pending settlement.  The case was thereafter stayed while the parties engaged in settlement negotiations and in settlement conferences conducted by another magistrate judge.  The settlement negotiation were unsuccessful and the Court, therefore, conducted a follow-up hearing on this motion on February 21, 2012.

**BACKGROUND**

This case arises out of the settlement of prior litigation between the Plaintiffs and Defendants regarding the division of their respective interests in aviation insurance brokerage businesses.  See Hill, et. al. v. DeWald, Consolidated Case No. 2:06-cv-1461-LDG-LRL.  Prior to

November 30, 2007, Plaintiffs Ronald Hill and Teresa Heckart and Defendant Leslie DeWald, collectively, owned all of the shares of stock in Aviation Insurance Holdings, Inc., a Nevada corporation ("AIH"). Mr. Hill owned most of the stock of AIH. AIH was the holding or parent company for aviation insurance brokerage companies in Nevada, Utah and other states. The Utah company was known as Aviation Insurance Services of Utah, Inc. (AIS-Utah). AIH owned 80 percent of the stock of AIS-Utah and Ms. DeWald owned 20 percent. Ronald Hill was a director and the president and chairman of the board of AIH. He was also a director and chairman of the board of AIS-Nevada and AIS-Utah. Ms. Heckart was a director and officer of AIH, AIS-Nevada and AIS-Utah. Ms. DeWald was a director and the president and chief executive officer of AIS-Utah. Ms. DeWald had previously been a director of AIH, but was removed from that position in 2006.

On November 30, 2007, the parties and their counsel appeared before the district court for a status conference in the prior litigation. During the hearing, counsel represented to the court that the parties had agreed to a settlement, the essential terms of which were as follows: Ms. DeWald agreed to surrender her stock in AIH, in exchange for all of the stock of AIS-Utah which would then become an independent company owned by her. Ms. DeWald agreed to change the name of AIS-Utah. (She later renamed it "Ascend Insurance Resources, Inc.") The parties also agreed to obtain an accounting to separate the assets and liabilities of AIS-Utah from AIH and AIS-Nevada. The parties also agreed not to solicit each other's customers or employees for a limited period of time.

Although counsel represented to the court that they did not anticipate significant complications or disputes resulting from the accounting, this proved not to be the case. The parties were unable to agree on certain "receivables" or the value of other "accounts" or "reserves" carried on the books of AIS-Utah. The district court subsequently conducted an evidentiary hearing on March 25-26, 2008 to resolve the issues between the parties, including whether there was an enforceable settlement agreement. At the conclusion of the hearing, the district court held that the parties had reached a settlement agreement on November 30, 2007 and had agreed to an accounting to determine if there were cash reserve accounts, and if so, where they were and how much was in

them. The court held, however, that AIH was not required to fund any cash accounts of AIS-Utah. *See Minutes of Court, Case No. 2:06-cv-1461, (#96).*

The parties thereafter executed a written settlement agreement on March 31, 2008. *See Motion to Compel (#62), Exhibit 6, Settlement Agreement.* Pursuant to paragraph W of the Recitals, the parties stated that they "intend to settle and resolve all of the disputes and claims between them in the Litigation, and to fully and finally release one another from any and all obligations they may have between themselves relating to their respective ownership and operation of AIH, AIS-Nevada and AIS-Utah, and the Litigation." *Settlement Agreement,* pg. 3. Pursuant to Section II of the agreement, the parties agreed to exchange their respective shares of stock in AIH and AIS-Utah and Ms. DeWald agreed to change the name of AIS-Utah as soon as possible. Section II. D. further provided that "[t]he renamed AIS-Utah shall retain all assets and liabilities of AIS-Utah." *Id.,* pg. 5. Pursuant to Section IV. A., Hill, Heckart, AIH and AIS-Nevada agreed to transfer to AIS-Utah all of its books and records.

Section V. of the settlement agreement contained the mutual releases by each party. The Plaintiffs point particularly to the language of the releases provided by Ms. DeWald and AIS-Utah:

> DeWald hereby discharges, releases and waives any and all claims, disputes, grievances, administrative claims, or causes of action arising from or related to the transactions or occurrences underlying the Litigation, whether asserted or unasserted, and whether known or unknown, which DeWald had, has or might have against Hill, Heckart, AIH and AIS-Nevada. DeWald acknowledges that the fulfillment of the terms of this Agreement constitute full satisfaction of, and shall be in consideration of, any and all claims for compensation and/or counsel fees and costs, disputes, causes of action, and other claims, whether asserted or unasserted, and whether known or unknown, including the financial state of AIS-Utah, which DeWald had, has, or might have against Hill, Heckart, AIH and AIS-Nevada as a result of or related to the transactions or occurrences underlying the Litigation, and hereby expressly settles all claims against, and releases and discharges Hill, Heckart, AIH and AIS-Nevada. The intent of this Paragraph V(E) is to release those claims arising from or related to the transactions and occurrences underlying the Litigation which have been or could have been asserted in the Litigation, and to release any rights DeWald had, has or may have under the Buy & Sell Agreement.

*Settlement Agreement*, pgs. 8-9, Section V. E. Paragraph F. contains identical release language on the part of AIS-Utah.

The current lawsuit concerns the "premium trust account" of AIS-Utah. Insurance agents or brokers are required to maintain "premium trust accounts" in which insurance premiums and return premiums are deposited pending transmittal to the insurer or customer/client. NRS 683A.400.2(b) provides that such account(s) shall be "separate from accounts holding the depositor's general personal, firm or corporate money," although "the depositor may commingle with such fiduciary money in a particular account such additional money as the depositor deems prudent to advance premiums, establish reserves for the payment of return commissions, or for other contingencies arising in his or her business of receiving and transmitting premiums or return premiums." Utah Code §31A-23a-409 provides that an agent or broker may not commingle trust funds with the agent's or broker's own money or money held in another capacity, except for amounts necessary to pay bank charges and money paid by insureds belonging in part to the agent or broker as a fee or commission.

In June 2010, Ms. DeWald's counsel notified Plaintiffs' counsel that there was a $687,148.67 deficiency in the AIS-Utah premium trust account as of April 3, 2008 and demanded that Plaintiffs' rectify that deficiency. In response Plaintiffs filed their instant complaint against Ms. DeWald for breach of the settlement agreement and declaratory relief. Ms. DeWald and Ascend, in turn, filed a counterclaim for recovery of the alleged deficiency.

In her affidavit filed in response to Plaintiffs' motion to dismiss her counterclaim, Ms. DeWald alleges that prior to April 3, 2008, AIS-Nevada maintained and managed a premium trust account on behalf of AIS-Utah. She states that prior to that date neither she nor any other AIS-Utah employee had access to the cash, bank statements or records relating to the AIS-Utah premium trust account. *See Opposition to Motion to Dismiss Counterclaims (#33), Exhibit A, DeWald Affidavit*, ¶¶7, 8. Ms. DeWald alleges that pursuant to the law and the settlement agreement, Plaintiffs were required to fully and legally fund AIS-Utah/Ascend's premium trust account by a transfer of funds from the original AIS-Utah premium trust account. ¶10. Plaintiffs, however, refused to fund AIS-Utah/Ascend's premium trust account until Ms. DeWald executed the written settlement agreement. ¶12. Plaintiffs thereupon funded Ascend's premium trust account in the amount of $1,654,544.60.

Ms. DeWald alleges that contrary to the terms of the settlement agreement, Plaintiffs refused to produce documents that would have shown whether AIS-Utah/Ascend's premium trust account was fully funded or "in trust" as required by Nevada law. ¶11. Ms. DeWald claims that AIS-Utah/Ascend did not receive the documents from the Plaintiffs which revealed that Ascend's premium trust account had been underfunded until June 2010. Ms. DeWald further contends that a forensic analysis conducted by Ascend revealed that the deficiency in the premium trust account can be traced to the time when Mr. Hill and Ms. Heckart were acting as trustees of the account. ¶14. Ms. DeWald further states that "[t]his problem with the PTA [premium trust account] was not known to me at the time of the 2008 settlement of the previous litigation . . . and said litigation did not include any PTA-related issues." ¶ 13. She further states that "[t]he prior litigation . . . did not address the PTA" and that "[a]ny audit or accounting that was conducted in the prior litigation did not concern the PTA." ¶¶ 15, 16.

Plaintiffs' Interrogatory No. 3 asked Ms. DeWald to identify and describe with particularity all facts and circumstances supporting her contention that representatives of AIS-Nevada and/or AIH informed Ascend that its new premium trust account was adequately funded, i.e., "in trust," pursuant to NRS 683A.400. Ms. DeWald responded that her contention is based on the provisions of the written settlement agreement, which provided that the "renamed AIS-Utah shall retain all assets and liabilities of AIS-Utah" and that Plaintiffs would transfer to AIS-Utah all of its books and records. Ms. DeWald also relied on NRS 683A.400 and Utah Code 31A-23a-409 and "upon eighteen years of practice with Ronald Hill, Theresa Heckart, AIH, AIS-NV and AIS-UT, in which it was represented to her that the trust funds for AIS-NV and AIS-UT were managed in accordance with the law, trust funds are 'sacred.'" *Opposition to Motion to Compel (#66), Exhibit G, Defendant Leslie DeWald's Answers to Plaintiffs' Interrogatories*, pgs. 2-3.

Plaintiffs allege that Ms. DeWald's attorneys and accountant were provided with documents or information prior to November 30, 2007 from which they could have determined whether there was a deficiency or "negative balance" in AIS-Utah's premium trust account. Plaintiffs also allege that there was correspondence between the parties' counsel and/or accountants prior to November 30, 2007 regarding a possible negative balance in the premium trust account. It appears to be

5

1  Plaintiffs' position that because Ms. DeWald was on notice of a possible deficiency in the AIS-
2  Utah premium trust account prior to November 30, 2007, she released Plaintiffs from liability for
3  any deficiency in that account pursuant to Section V of the settlement agreement–notwithstanding
4  that Plaintiffs did not fund the premium trust account until after the settlement agreement was
5  executed.
6        Plaintiffs further allege that because the settlement agreement was negotiated by the parties'
7  attorneys, Ms. DeWald has placed her communications with her former counsel in issue as they
8  relate to the status of the premium trust account prior to the settlement agreement.  Plaintiffs served
9  written discovery requests on Ms. DeWald which seek disclosure of her communications with her
10  attorneys or accountant in the prior litigation.  *Motion to Compel (#62), Exhibit 14, First Set of*
11  *Combined Discovery to Leslie DeWald.*  These requests include interrogatories which ask whether
12  Ms. DeWald's former attorneys or accountant knew that the "cash status of AIS-UT was negative
13  prior to November 30, 2007?" *Id. Interrogatory Nos. 8, 9.*  Plaintiffs also ask Ms. DeWald to
14  explain why she did not hire prior counsel to represent her in this case and whether she has made
15  any claims or demands against her former attorneys or accountant.  *Interrogatory Nos. 7, 10.*
16  Plaintiffs have not included or attached to their motion to compel Ms. DeWald's responses to their
17  written discovery requests.  The Court, therefore, does not have information regarding Defendants'
18  objections or the grounds thereof.  Pursuant to LR-26-7(a), it is the movant's obligation to set forth
19  the discovery requests and responses at issue in its motion.
20        Plaintiffs also served notices of deposition on Ms. DeWald's former attorneys Fred "Pete"
21  Gibson, Esq. and  his law firm Lionel Sawyer & Collins, and on attorney Adam Smith, Esq.
22  *Motion to Compel (#62), Exhibits 11, 12 and 13.*  The notice of deposition to Mr. Gibson includes
23  written questions pursuant to Fed.R.Civ.Pro. 31.  Among the questions that Plaintiffs ask Mr.
24  Gibson is whether there is any dispute or adversity between Ms. DeWald and Mr. Gibson and his
25  law firm. *Exhibit 12, Questions 10 and12*.  Plaintiffs also ask Mr. Gibson whether Ms. DeWald's
26  statement in her affidavit that she was not aware until 2010 that there was any deficiency in the
27  premium trust account is an accurate statement or "an outright lie."  *Id. Questions 24 and 25.*
28  Plaintiffs also intend to depose attorney Adam Smith about his communications with Ms. DeWald

including presumably communications regarding any deficiency in the premium trust account prior to the settlement agreement. Ms. DeWald's former attorneys responded by letter to Plaintiffs' deposition notices asserting objections based on the attorney-client privilege, attorney work-product doctrine and "Formal Opinion 41 of the State Bar of Nevada Standing Committee on Ethics and Professional Responsibility." *Motion to Compel (#62), Exhibits 1 and 2.*

## DISCUSSION

**1. Relevance:** Rule 26(b) of the Federal Rules of Civil Procedure states that a party may obtain discovery regarding any nonprivileged matter that is relevant to any party's claim or defense. Relevancy under the rule is liberally construed. The party opposing discovery has the burden of showing that it is over broad, unduly burdensome or irrelevant. *Phillips v. Clark County School Dist.*, 2012 WL 135705, *4 (D.Nev. 2012).

Defendants DeWald and Ascend argue that upon execution of the settlement agreement, Plaintiffs had the legal duty to turn over to DeWald/Ascend all premium trust funds held on behalf of AIS-Utah. Defendants argue that the premium trust account funds were not subject to the release provisions of the settlement agreement because the funds were not the property of either party. There also is no evidence that the parties had agreed upon the amount that Plaintiffs would turn over to fund the AIS-Utah/Ascend premium trust account prior to executing the settlement agreement. Defendants allege that Plaintiffs did not, in fact, provide the information from the which the alleged deficiency could be determined until more than two years after the settlement agreement was executed. Plaintiffs argue, however, Ms. DeWald's attorneys and accountant were on notice of a possible deficiency in the AIS-Utah premium trust account prior to the execution of the settlement agreement. Apparently based on this alleged notice and the broad language of the release provisions in the settlement agreement, Plaintiffs argue that Ms. DeWald and AIS-Utah/Ascend released them from liability for a potential deficiency in the premium trust account.

Plaintiffs are entitled to conduct reasonable discovery in an attempt to demonstrate that the broad and general release provisions of the settlement agreement included a release of liability for any deficiency in the AIS-Utah premium trust account. Parole evidence is admissible for ascertaining the true intentions and agreement of the parties when the written instrument is

ambiguous. *M.C. Multi-Family Dev. v. Crestdale Assocs.*, 124 Nev. 901, 914, 193 P.3d 536 (2008). *See also Phillips v. Clark County School Dist.*, 2012 WL 135705, *5 (D.Nev. 2012). Evidence that Defendants' prior attorneys or accountant received information from Plaintiffs' counsel or accountant regarding the status of the AIS-Utah premium trust account or that Plaintiffs' and Defendants' counsel discussed a possible deficiency in the AIS-Utah premium trust account are relevant and discoverable under the broad parameters of Rule 26(b). Plaintiffs, therefore, are not precluded from deposing Ms. Dewald's former counsel, Mr. Gibson and Mr. Smith, or her accountant, Mr. Bertch, on these non-privileged matters.

**2. Attorney-Client Privilege or Work Product Doctrine:** Plaintiffs also seek to inquire into the pre-settlement communications between Ms. DeWald and her attorneys on the grounds that such discovery may impeach Ms. DeWald's statement that the "problem with the PTA was not known to me at the time of the 2008 settlement of the previous litigation . . . and said litigation did not include any PTA-related issues." *DeWald Affidavit*, ¶ 13. Plaintiffs argue that DeWald has placed her communications with her prior attorneys in issue and that she has impliedly waived the attorney-client privilege as to such communications.

Rule 501 of the Federal Rules of Evidence provides that in civil actions and proceedings, with respect to an element of a claim or defense as to which state law supplies the rule of decision, the privilege of a witness, person, government, state or political subdivision thereof shall be determined in accordance with state law. This case involves the meaning of a settlement agreement regarding underlying state law contractual disputes between individuals and corporations who are citizens or residents of Nevada and Utah. Mr. Hill and Ms. Heckart are Nevada citizens and AIS-Nevada and AIH are Nevada corporations. Ms. DeWald is a citizen of Utah and AIS-Utah and its successor Ascend were/are Utah corporations. While Nevada law probably governs the application of the attorney-client privilege in this case, Utah law is also relevant since Ms. DeWald is a citizen of Utah and the prior litigation and settlement agreement concerned her rights and liabilities in a Utah brokerage business. Ms. DeWald also relies on both Nevada and Utah insurance statutes in regard to her claim relating to the AIS-Utah premium trust account.

. . .

1    The attorney-client privilege protects the confidential communications between a client and his or her attorney, including confidential communications between their respective representatives, made for the purpose of rendering or obtaining legal advice or legal services. Nevada Revised Statute (NRS) 49.095. *See also United States v. Graf*, 610 F.3d 1148, 1156 (9th Cir. 2010) (setting forth elements of the attorney-client privilege under federal common law). Under Nevada law, the attorney-client privilege is waived when the client voluntarily reveals to a third person a significant portion of the communication with the attorney. *Manley v. State*, 115 Nev. 114, 120, 979 P.2d 703 (1999); *Molina v. State*, 120 Nev. 185, 193 n. 22, 87 P.3d 533, 539 n. 22 (2004).

    The attorney-client privilege may be impliedly waived when a party asserts a claim or affirmative defense which places his or her communications with counsel at issue in the litigation. As the Tenth Circuit stated in *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.*, 136 F.3d 65, 699-700 (10th Cir. 1998), courts generally employ some version of one of three approaches to determine whether a litigant has waived the attorney-client privilege:

> The first of these general approaches is the "automatic waiver" rule, which provides that a litigant automatically waives the privilege upon assertion of a claim, counterclaim, or affirmative defense that raises as an issue a matter to which otherwise privileged material is relevant. The second set of generalized approaches provides that the privilege is waived only when the material to be discovered is both relevant to the issues raised in the case and either vital or necessary to the opposing party's defense of the case. Finally, several courts have recently concluded that a litigant waives the attorney-client privilege if, and only if, the litigant directly puts the attorney's advice at issue in the litigation.

    The second approach referred to in *Frontier* was originally formulated in *Hearn v. Rhay*, 68 F.R.D. 574, 581 (E.D.Wash. 1975) and is considered the majority view. *See Public Service Co. of N.M. v. Lyons*, 10 P.3d 166, 171-72 (N.M.App. 2000). The majority approach is more fully defined in *Hearn* as follows:

> All of these established exceptions to the rules of privilege have a common denominator; in each instance, the party asserting the privilege placed information protected by it in issue through some affirmative act for his own benefit, and to allow the privilege to protect against disclosure of such information would have been manifestly unfair to the opposing party. The factors common to each exception may be summarized as follows: (1) assertion of the privilege was a result of some affirmative act, such as filing suit, by the asserting party; (2) through this affirmative act, the asserting party

9

>put the protected information at issue by making it relevant to the case; and (3) application of the privilege would have denied the opposing party access to information vital to his defense. Thus where these three conditions exist, a court should find that the party asserting a privilege has impliedly waived it through his own affirmative conduct.

*See also Synalloy Corp. v. Gray*, 142 F.R.D. 266, 269 (D.Del. 1992).

The New Mexico Court of Appeals notes that the majority approach has been criticized because it has been applied in a confusing and uneven manner by the courts. *Public Service Co. of N.M. v. Lyons*, 10 P.3d at 173. The New Mexico court agreed with the criticism of the Third Circuit in *Rhone-Poulenc Rorer Inc. v. Home Indemnity Co.,* 32 F.3d 851, 864 (3rd Cir.1994) that the majority approach rests on a conclusion that the information sought is relevant and should in fairness be disclosed. *Rhone-Poulenc* stated, however, that relevance is not the standard for determining whether evidence should be protected from disclosure as privileged:

>[F]inding that confidentiality may be waived depending on the relevance of the communication completely undermines the interest to be served.  Clients will face the greatest risk of disclosure for what may be the most important matters.  Furthermore, because the definition of what may be relevant and discoverable from those consultations may depend on the facts and circumstances of as yet unfiled litigation, the client will have no sense of whether the communication may be relevant to some future issue, and will have no sense of certainty or assurance that the communication will remain confidential.
>
>A party does not lose the privilege to protect attorney client communications from disclosure in discovery when his or her state of mind is put in issue in the action. While the attorney's advice may be relevant to the matters in issue, the privilege applies as the interests it is intended to protect are still served by confidentiality.

*Id.* 32 F.3d at 864.

Based on these reasons, the New Mexico court adopted the more restrictive third approach which recognizes waiver of the attorney-client privilege "only where a party 'seeks to limit its liability by describing that advice and by asserting that he relied on that advice.'" *Public Service Co. of N.M.*, 10 P.3d at 173.

The Nevada Supreme Court has not as yet adopted any of the three approaches.  The Ninth Circuit appears to follow the majority approach. *See Chevron Corp. v. Pennzoil Co.*, 974 F.2d

1156, 1162 (9th Cir. 192); *United States v. Amlani*, 169 F.3d 1189 (9th Cir. 1999) and *Bittaker v. Woodford*, 331 F.3d 715, 719 (9th Cir. 2003). *Bittaker* explains how implied waiver should be applied by the court:

> [T]he doctrine of implied waiver allocates control of the privilege between the judicial system and the party holding the privilege." *Privileged Communications,* 98 Harv. L.Rev. at 1630. The court imposing the waiver does not order disclosure of the materials categorically; rather, the court directs the party holding the privilege to produce the privileged materials *if* it wishes to go forward with its claims implicating them. The court thus gives the holder of the privilege a choice: If you want to litigate this claim, then you must waive your privilege to the extent necessary to give your opponent a fair opportunity to defend against it. *See, e.g., Amlani,* 169 F.3d at 1195 (holding that courts must evaluate "whether allowing the privilege would deny the opposing party access to information vital to its defense" (internal quotation marks omitted)); *Chevron,* 974 F.2d at 1162. Essentially, the court is striking a bargain with the holder of the privilege by letting him know how much of the privilege he must waive in order to proceed with his claim.

*Bittaker* further states that the court must impose a waiver no broader than needed to ensure the fairness of the proceedings before it. *Id.* 331 F.3d at 720.

In *Terry v. Bacon*, 269 P.3d 188 (Utah App. 2011), the Utah Court of Appeals, without formally adopting any of the three approaches, found implied waiver of the attorney-client privilege under the most restrictive approach in a dispute involving whether the plaintiffs had entered into a settlement agreement with the defendant. The defendant asserted that the plaintiffs had agreed, through their counsel, to settle their medical malpractice claim for $15,000 and that the plaintiffs' attorney had promised that the plaintiffs would sign the settlement documents and dismiss the case with prejudice. The plaintiffs' attorney later informed defendant's attorney that plaintiffs no longer wanted to settle and were seeking a second opinion. The plaintiffs, through new counsel, opposed defendant's motion to enforce the settlement. The plaintiff husband asserted that he had never accepted defendant's settlement offer. The court, over plaintiffs' objection, permitted their former attorney to testify that plaintiff had authorized him to accept the defendant's settlement offer. Based on the attorney's testimony, the court held that there was an enforceable settlement agreement. In affirming the trial court's holding that plaintiffs had impliedly waived the attorney-client privilege, the Court of Appeals stated:

> Here, the trial court allowed former counsel to testify only as to the attorney-client communications directly related to whether the Terrys had instructed him to accept the $15,000 settlement offer. By cautioning former counsel to avoid any discussions about the merits of the Terrys' claims, the trial court carefully narrowed the intrusion into attorney-client discussions. In addition, even as identified by the Terrys, the heart of the matter is the substance of the communications between the Terrys and former counsel concerning the $15,000 settlement offer. Although the Terrys claim that they are not placing "their [former] attorney's conduct in issue," Mr. Terry asserts, "I have never told anyone that I would accept $15,000 to settle my case," and, "I have never agreed to settle my case for $15,000, nor would I ever settle for this amount." Likewise, the Terrys claim that they "never at any time accepted the alleged settlement offer, and never would accept such an offer" and that they "at no time entered into a settlement agreement or accepted $15,000 to settle their claims against [defendants]." By the Terrys' own arguments, it is apparent that what they communicated to former counsel was at the center of their claim that the settlement agreement was unenforceable.

*Terry*, 269 P.3d at 194.

The court further stated that the plaintiffs "should not be permitted to use the privilege as a sword by relying on their statements about what was not said during the communications with former counsel, while also asserting the attorney-client privilege as a shield when the defendants attempt to refute those assertions." *Id.*

Other courts, applying the majority approach, have also found implied waiver of the attorney-client privilege where a party has affirmatively placed in issue its understanding or the meaning of a contract or settlement agreement that was negotiated by its counsel. *Pitney-Bowes v. Mestre*, 86 F.R.D. 444 (S.D.Fla. 1980) (party impliedly waived the attorney-client privilege by placing in issue its intention in entering into certain patent royalty agreements and its understanding of when those agreements expired); *Synalloy Corp. v. Gray*, 142 F.R.D. 266 (D.Del. 1992) (defendant impliedly waived the attorney-client issue by placing in issue whether the claim on which plaintiff sued was released pursuant to a prior settlement agreement between the parties).

In this Court's view, the Nevada Supreme Court will likely adopt either the majority approach to implied waiver set forth in *Hearn v. Rhay* or the more restrictive approach set forth in *Frontier Refining, Inc. v. Gorman-Rupp Co., Inc.* and *Public Service Co. of N.M. v. Lyons, supra*. Even under the majority approach, the facts in this case do not presently support a finding of implied waiver of the attorney-client privilege. Plaintiffs have not provided any evidence that the

AIS-Utah premium trust account was, in fact, a subject of the settlement negotiations between the parties' counsel.  As stated above, the premium trust funds were not the property of either party.  They were not a subject of the evidentiary hearing on May 25-26, 2008 and they were not mentioned in the written settlement agreement.  At most, Plaintiffs assert that Ms. DeWald's attorneys or accountant were provided with information prior to the settlement agreement about a potential deficiency in the premium trust account.   Unless, the testimony of Ms. DeWald's former counsel provides some basis for concluding that the premium trust account was actually a subject matter of the parties' settlement negotiations, there is no basis to find that Ms. Dewald has placed her confidential  communications with counsel in issue, or that access to those confidential communications is vital to Plaintiffs' defense to her counterclaim.  Accordingly,

**IT IS HEREBY ORDERED** that Plaintiffs' Motion to Compel (#62) is **denied** insofar as it seeks an order requiring Defendants or their former counsel to disclose confidential attorney-client communications based on the alleged implied waiver of the attorney-client privilege.  Plaintiffs are not precluded, however, from conducting discovery regarding the communications that occurred between Plaintiffs' and Defendants' counsel relating to the premium trust account.

DATED this 16th day of March, 2012.

_____
GEORGE FOLEY, JR.
United States Magistrate Judge